UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06CV-364-H

EBONI COCHRAN, et al.                                                    PLAINTIFFS

V.

OXY VINYLS LP                                                            DEFENDANT

**MEMORANDUM OPINION**

Plaintiffs have brought this action against Defendant seeking monetary and injunctive relief for property damage allegedly resulting from fallout and noxious odors emitted by Defendant's manufacturing facility.  Plaintiffs have renewed their previously-filed motion for class certification by filing a report by Roger Wabeke.  Defendant has again objected to certification of the proposed class.

Having reviewed Plaintiffs' supporting memorandum, heard arguments, and evaluated the evidence, the Court finds Plaintiffs' motion to be deficient in several significant ways.  Therefore, the Court will deny the motion to certify a class.

I.

Plaintiffs, some 185 residents of neighborhoods surrounding the industrial area known as "Rubbertown," have alleged that emissions from Defendant's operations in its nearby plant have invaded their property in the form of particulate matter ("fallout") and noxious odors.  The particulate matter is described as blanketing Plaintiffs' property, and is characterized variably as black soot, white dust, white ash, white powder, and a green-yellow substance.  Descriptions of

the odors are similarly varied and include chemical, toxic, sulfuric, acidic, rotten eggs, manure, garbage, a sewer smell, and a sweet smell that is nauseating.

Defendant Oxy Vinyls LP ("Oxy Vinyls") operates a plant in the Rubbertown area, at which it manufactures polyvinyl chloride resins ("PVC").  Defendant's plant is one of several industrial facilities in the Rubbertown area.[1]  At its plant, Defendant operates three boilers to provide steam for its operations and those of some of the surrounding facilities.  Def.'s Resp. to Pls.' Renewed Mot. for Class Certification at 3.  Two of these boilers are coal-fired, and the third runs on natural gas.  *Id.*  These boilers cause emissions, as Plaintiffs have amply documented.  Pls.' Mot. for Class Certification at 7–12.  Plaintiffs allege that these emissions have invaded their property in the form of odors and particulate matter.

Plaintiffs filed their complaint on July 28, 2006, alleging nuisance, negligence and/or gross negligence, strict liability for ultrahazardous activities, and trespass.  On February 15, 2007, Plaintiffs moved for class certification under Federal Rules of Civil Procedure ("Rules") 23(b)(2) and 23(b)(3), defined as follows:

> Owners or residents of single family residences within two miles of the Oxy Vinyl [sic] facility, who allege the invasion of their property by noxious odors, fallout, pollutants and contaminants which originated from the Oxy Vinyl [sic] facility located in Louisville, Kentucky and who have owned or resided at that single family residential home from July 28, 2003 to the present and continuing and who claim damage therefrom.

Pls.' Mot. for Certification of a Class Action, ¶ 3.  Plaintiffs estimate that this class may consist of 33,865 people or more.  *Id.*

---

[1]Defendant's property is bordered by Zeon Chemical LP, Lubrizol Advanced Materials, PolyOne Corporation, Carbide Industries, LLC, and a Metropolitan (Louisville) Sewer District Pumping Station.  Def.'s Resp. to Pls.' Renewed Mot. for Class Certification at 3.

The Court held a lengthy hearing on Plaintiffs' motion on October 19, 2007, at which Plaintiffs presented the evidence based upon which they argued class certification was warranted.  At that hearing, the Court registered its concerns regarding the strength of Plaintiffs' evidence, and noted that Plaintiffs' showing did not include any evidence from which the Court could reasonably conclude that the requirements of Rule 23 had been met.  Specifically, the Court noted the absence of any evidence tying the proposed class area together.[2]

Despite its belief (and Plaintiffs' counsel's apparent agreement) that Plaintiffs' motion for class certification was insufficiently supported by the evidence, the Court acceded to Plaintiffs' counsel's plea that it remand the motion from its docket rather than deny it outright. Four and one-half months later, on February 29, 2008, Plaintiffs filed a two-page "Renewed Motion for Class Certification."  No new memorandum accompanied this motion, which simply directed the Court's attention to "a scientific [r]eport based upon analysis of particulate within the proposed class definition," noted two Sixth Circuit cases "not previously cited in Plaintiffs' Motion and Brief for Class Certification," and indicated Plaintiffs' reliance upon their original motion of February 15, 2007.  Pls.' Renewed Mot. for Class Certification, ¶¶ 2–3, 5–6.  Absent any other new evidence submitted by Plaintiffs, the question for the Court at this time is whether

---

[2] Contrary to several subsequent comments made by Plaintiffs' counsel in this and other cases, the Court did not instruct Plaintiffs to provide a particular *type* of evidentiary support for its motion to certify, but merely observed that in this case it appeared something more was necessary, and that in many other cases the Court had reviewed the opinion of an expert on the reasonableness of the proposed class definition had been found to be persuasive. Since the October 2007 hearing, Plaintiffs' counsel has repeatedly characterized the Court's statements as deeming an expert report a *necessary* prerequisite to class certification.  But as the Court has explained on multiple occasions to Plaintiffs' counsel in this and other similar cases currently before this Court, "an expert report is *but one type* of evidence a court may consider when deciding whether a proposed class meets the requirements of Rule 23." *Burkhead v. Louisville Gas & Elec. Co.*, 2008 WL 1805487, *1 (W.D. Ky. Apr. 18, 2008) (emphasis added).  Thus, what Plaintiffs' counsel has framed as the Court's "profound requirement" that Plaintiffs submit an expert report is really nothing more than the Court's suggestion that an expert report might be helpful "where no other evidence was presented tying together the class proposed by Plaintiffs." *Id.*  Plaintiffs' counsel's interpretation of the Court's statements on this issue "ignore[] that the Court found the lack of an expert report *symptomatic* of the [class certification] motion's flaws, not dispositive on the issue of class certification." *Id.* (emphasis in original).

this expert report addresses the significant infirmities in Plaintiffs' original showing on the issue of class certification.[3]  Therefore the Court believes it appropriate to begin with a detailed description of the report.

## II.

The report Plaintiffs submitted in support of their renewed class certification motion was compiled by Roger Wabeke, an industrial hygenist retained as an expert by Plaintiffs' counsel in several similar cases before this Court.  Mr. Wabeke[4] completed his report after reviewing documents and data provided to him by Plaintiffs' counsel and conducting a "two-day survey of the environs of the Oxy Vinyls plant, neighborhoods of those claiming intrusions of air pollutants onto their property, and surrounding areas."  During this "two-day survey," he not only collected samples of air and settled dust, but also interviewed "several people residing in nearby neighborhoods."  Pls.' Renewed Mot. for Class Certification, Exhibit 2 (hereinafter

---

[3]Plaintiffs' Renewed Motion for Class Certification contained only two new legal references:  *Beattie v. Centurytel, Inc.*, 511 F.3d 554 (6th Cir. 2007) and *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006).  Plaintiffs argue only that these cases "stand for the standards for grant of [sic] class certification and for the proposition that a merits based inquiry is not a proper expression of the rigorous analysis doctrine for FRCP 23 consideration."  Pls.' Renewed Mot. for Class Certification at ¶ 7.  Except for their recitation of the standard class certification analysis, which tracks the Court's analysis below, the cases are of little use.

In *Daffin*, the Sixth Circuit plainly notes that "this is not a case . . . in which different class members were exposed to different products such that the uncommon issue of causation predominated over the lesser shared issues."  458 F.3d at 554.  As will be clear in the discussion below, the instant case is such a case..

In *Beattie*, the facts are similarly distinguishable, as that entire case hinged on "exposure" to a certain practice by the defendant.  That is, as in *Olden*, the court could be confident that if harm was experienced by a class member, it was attributable to the defendant's conduct.  As will be discussed below, this is not the case here.

Far from being contradicted or called into question by *Beattie* and *Daffin*, the Court's analytical framework is, if anything, reaffirmed by reference to them.  Plaintiffs' insinuation that these cases should alter the Court's approach to class certification in this case is thus wholly inaccurate and is actually undermined by the very cases to which they cite.

[4]Elsewhere the Court has referred to Mr. Wabeke as "Dr. Wabeke."  *See, e.g., Brockman v. Barton Brands, Ltd.*, 2007 WL 4162920 (W.D. Ky. Nov. 21, 2007).  Though the parties and the Court lapsed into this appellation, it appears that despite holding several advanced degrees and certifications, Mr. Wabeke does not actually hold a doctorate.  Therefore the Court will refer to him using what appears to be the appropriate title.

"Wabeke Report"), at 1.  Mr. Wabeke also obtained "meteorological data" for the Louisville's

Standiford Field Airport for the dates he conducted his survey.  *Id.*

A.

In his report, Mr. Wabeke discusses a single "settled dust specimen" which, using a

"fresh 3" x 5" note card" he scraped from the windshield of a car that had been positioned

"underneath a shed roof" located within the proposed class area and less than one mile from the

Oxy Vinyls facility for "more than a year."  *Id.* at 4.  Without elaboration, Mr. Wabeke

characterizes this sample as "the most representative settled dust sample.  *Id.*  Mr. Wabeke sent

the sample to a lab, which, according to his report, measured the size of the particles and found

that the sample contained "mineral material, plant tissue material, fibers, black rubber, coal dust,

mold, coal combustion products, glass, corrosion particles, and flyash."  *Id.*  Based on this

information, and again without further elaboration, Mr. Wabeke concluded that "to a reasonable

degree of scientific certainty, the coal dust, coal combustion products, and the flyash originated

from the Oxy Vinyls' [sic] facilities."  *Id.* at 5.

Interestingly, it appears that Mr. Wabeke's report omits a great deal of information

regarding his sampling of "settled dust."  For example, Mr. Wabeke apparently collected ten (10)

other "settled dust" samples during his visit to the Louisville area, all of which he sent to the

same lab for analysis.  Several of these samples were taken within the proposed class area.

Def.'s Resp. to Pls.' Renewed Mot. for Class Certification at 10.  None of these other ten

samples is mentioned in Mr. Wabeke's report.

Additionally, Mr. Wabeke characterizes the lab's findings in an at-best-incomplete

manner.  The entirety of the lab's findings regarding that sample read as follows:

5

> The particulate was a fine powder, appearing brownish overall, most of which consisted of particles from 10 to 150 µm in size.  A limited number of fibers and fibrous plant tissue particles up to several millimeters long were also seen.  The major components were mineral grains, mainly quartz, feldspars and carbonates (60-70%) and plant tissue material (10-20%).  Present as minor components at levels of 1-5% were fibers, black rubber, combustion products, mold and coal dust.  Trace levels (< 1%) of glass, flyash and corrosion particles were also present.

Def.'s Resp. to Pls.' Renewed Mot. for Class Certification, Exhibit E at 3.  While it appears that the lab may not have included all of this information in its letter to Mr. Wabeke, the material that was sent to him clearly indicated that the coal dust and combustion products were "minor components" and the flyash a "trace component" of the sample.  Def.'s Resp. to Pls.' Renewed Mot. for Class Certification, Exhibit F at Table I.  The lab also informed Mr. Wabeke that at such small levels (1-10% for "minor components" and less than 1% for "trace components"), "more specific percentages are of very limited reliability." *Id* at 2.  Furthermore, Mr. Wabeke opted not to mention that several of the ten samples also appear to contain flyash, combustion products, coal dust, or some combination thereof, as trace components, and none of the samples contains any of these materials as a major component. *Id.* at Table I.

B.

Mr. Wabeke devoted approximately one-fourth of his report to explaining why air modeling is an unreliable method for assessing the dispersion of "airborne particulates."  He characterizes such modeling as "replete with systematic errors and uncertainties," and asserts that in contrast, "[t]he best way to assess and evaluate air pollution in an impacted community is to actually take air samples of air contaminants in that community."  Wabeke Report at 3.  This "air sampling" approach "can be augmented by collecting representative settled dust samples and matching the characteristics of the dust to the most probable emission source." *Id.* at 4.

6

Mr. Wabeke took twelve (12) air samples while in the Louisville area.  He took these samples using a device that apparently takes in one liter of air "through a laser particle counting chamber" and displays the number and size of particles present in that liter of air.  Wabeke Report at 6.  The device does not analyze the composition of the particles it detects, nor does it provide any other information about them besides their size.  Mr. Wabeke's report refers to "airborne dust particles," but it is clear that his examination of what was in the air at each sampling site consisted solely of determining whether any solid substances were in the air, and if so, how many particles of those substances were in the air and how big they were.  No analysis of what the particles were was ever conducted.

Mr. Wabeke took three air samples across the Ohio River from Louisville, east and northeast of the Oxy Vinyls facility.  He took four samples north and west of the facility, and five samples east and northeast of the facility.  All samples were taken within two miles of the facility, at varying distances therefrom.  No samples were taken in the southern half of the proposed class area.

Mr. Wabeke reports that the highest concentration of airborne particles was detected at a location described only as "ENE of Oxy Vinyls plants," but which Mr. Wabeke has indicated was approximately 0.15 miles from the Oxy Vinyls plant.  *Id.*  Furthermore, Mr. Wabeke reports that the concentration of airborne particles was higher at the sampling locations northeast of the Oxy Vinyls facility than at others.  Based on these observations and the fact that he observed the wind blowing from the west-southwest, Mr. Wabeke concluded that there was "a slowly diffusing plume of 0.3 to 10-micron diameter particles moving in an east north easterly direction from Oxy Vinyls' facilities."  *Id.*

As with his sampling of "settled dust," Mr. Wabeke apparently took a number of air samples that he did not mention in his report. The fact that he did so does not appear to be in dispute; what remains unknown is what those samples showed. Defendant's attempts to discover this information have been unavailing, a situation which regrettably has necessitated the Court's involvement. *See Cochran v. Oxy Vinyls LP*, No. 06-364 (W.D. Ky. July 30, 2008). Furthermore, Mr. Wabeke testified that he did not determine whether Oxy Vinyls was emitting anything from its smokestacks at the time of his air sampling, and it appears that his assessment of the direction from which the wind was blowing was based solely on his use of the "wet finger technique" and a review of meteorological data from Louisville's Standiford Field Airport, which lies several miles from the Oxy Vinyls facility.

The foregoing summarizes the full extent of Mr. Wabeke's report. Now the Court must determine whether this report can justify the class Plaintiffs propose.

III.

The Court has recently had several opportunities to consider class certification issues in similar cases also litigated by Plaintiffs' counsel. *See Burkhead v. Louisville Gas & Elec.*, 2008 WL 782829 (W.D. Ky. Mar. 21, 2008); *Brockman v. Barton Brands, Ltd.*, 2007 WL 4162920 (W.D. Ky. Nov. 21, 2007). In both of those cases, the Court denied certification of classes defined a similar manner as here.

At no point following *Brockman* or *Burkhead* has any party questioned the legal authorities or analytic framework set therein. And certainly if anyone believed the Court's approach to the question of class certification in this case to be erroneous, the Court assumes that

8

Plaintiffs would identify any misunderstandings rather than simply re-submitting their February 2007 memorandum.

Regardless, the Court has reexamined the relevant authorities and their application here. This review left the Court confident of its approach. Therefore, the Court will refer to the same authorities cited in *Brockman* and *Burkhead*, often using language and analysis that closely tracks those cases. Certainly differences between the factual records in those cases and the factual record here will require different applications of these authorities, but nothing in the discussion below should be interpreted as implying a divergence from the framework set forth in *Brockman* and *Burkhead*.

IV.

A district court has broad discretion in determining whether class certification is appropriate. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). In arriving at that determination, however, the court should avoid a "preliminary inquiry into the merits of a suit," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), as the likelihood or lack thereof that these individual Plaintiffs and class members may have valid claims against Oxy Vinyls is not relevant to the question of combining their claims. Yet "sometimes it is necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) §21.14 (2004), and as such, it is hardly inappropriate for a court to conduct a "rigorous analysis" to determine whether the requirements of Rule 23 are met. *Falcon*, 457 U.S. at 161. And of course Plaintiffs not only must satisfy the requirements of Rule 23(a), but here they also bear the burden of proving the requisite elements of class certification

9

under either or both of Rules 23(b)(2) and (b)(3).  *In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *Falcon*, 457 U.S. at 161).

To meet the requirements of Rule 23(a):  (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class. *Olden v. LaFarge Corp.,* 383 F.3d 495, 507 (6th Cir. 2004) (citing Fed R. Civ. P. 23(a)).  Once certified, a class may be altered, expanded, subdivided, or even vacated.  *See* Fed. R. Civ. P. 23(c)(1); 23(c)(4)(B).  But again, Plaintiffs carry the burden to plead a sufficient basis for sustaining a motion for class certification.  *Tucker v. Union Underwear Co., Inc.,* 144 F.R.D. 325, 327 (W.D. Ky. 1992) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976)).

The Court will address each Rule 23(a) requirement in turn, but as in *Brockman* and *Burkhead*, the Court must first consider an overriding concern particular to the type of class proposed here.

A.

"Although not specifically mentioned in [Rule 23], the definition of the class is an essential prerequisite to maintaining a class action." *Adams v. Fed. Materials Co.,* 2006 WL 3772065 at *3 (W.D. Ky. Dec. 19, 2006) (quoting *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 335 (E.D. Ky.2002)). The description must be "sufficiently definite that it is administratively feasible for the court to determine whether a particular individual is a member." 7A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1760, at 120-21 (2d ed.1986).

As this Court has discussed in the past, courts have rejected certifying proposed classes where plaintiffs failed to "identify any logical reason . . . for drawing the boundaries where they did." *See, e.g., Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 602–03 (D. Colo. 1990) (holding that the plaintiffs had "failed to identify a class" where the proposed boundaries did not appear to "relat[e] to the defendants' activities," but were instead "arbitrarily . . . drawn lines on a map"). Scientific or objective evidence usually closely ties the spread of the alleged pollution or contamination to the proposed class boundaries, and numerous mass environmental tort cases support this proposition. *See Burkhead*, 2008 WL 1805487, at *3–4 (citing, in order of appearance, *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 61–62 (S.D. Ohio 1991); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 643 (N.D. Cal. 1987); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 476 (D. Colo. 1998); *Daigle,* 133 F.R.D. at 602-03; *Duffin v. Exelon Corp.*, 2007 WL 845336 (N.D. Ill. Mar. 19, 2007); *Blake v. Chemlawn Svcs. Corp.*, 1988 WL 6151 (E.D. Pa. Jan. 26, 1988); *Reilly v. Gould, Inc.,* 965 F. Supp. 588, 597 (M.D. Pa. 1997)).

Again, Rule 23 does not explicitly command evaluation of the proposed class definition. Understandably, therefore, many courts have opted not to do so. *See, e.g., Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001). Moreover, the Sixth Circuit has not deemed the failure to conduct such an evaluation an abuse of discretion. *Olden*, 383 F.3d 495. But importantly, the Sixth Circuit has not *endorsed* this approach, nor has it criticized the more thorough approach. Therefore the Court continues to believe, as it did in *Brockman* and *Burkhead*, that the more thorough approach better ensures the purposes of the class action mechanism.

The Court's review of the record, even as supplemented by Mr. Wabeke's report, reveals an insufficient relationship between the proposed class definition and the evidence provided regarding the emissions of the Oxy Vinyls facility. In total, the record consists of the complaints of several individuals located in relatively geographically-confined sections of the proposed class area about heterogenous substances and odors, lengthy recitals of the emissions of the Oxy Vinyls facility, and Mr. Wabeke's report. The complaints and the emissions records are insufficient standing alone, as the Court observed in October 2007.

That is what led the Court to urge Plaintiffs to seek some sort of evidence tying the proposed class together. Mr. Wabeke's report utterly fails to substantiate any sort of evidentiary relationship between the proposed class members that would justify certification of the proposed class. The Wabeke report has numerous infirmities, but the most significant is that the dust and air samples he collected are virtually meaningless.

Quite obviously, a single sample of "settled dust" shows little if anything about the condition of any property other than that on which the sample was collected. It would be at best

12

irresponsibly speculative for the Court to extrapolate from a solitary dust sample the idea that property belonging to tens of thousands of other individuals was so similarly affected as to recommend adjudication of this case as a class action.

And though Mr. Wabeke took a greater number of air samples, the startling lack of information he provides regarding anything other than their size renders them equally uninformative.  For example, the particles detected by Mr. Wabeke's air sampling could have been anything from coal dust to ground cinnamon to the pixie dust of Disney movie fame; Mr. Wabeke makes no attempt to determine their identity.  Additionally, Mr. Wabeke makes no attempt to account for his sampling locations' proximity to other pollution-emitting facilities in this highly industrialized area, including Louisville Gas & Electric's Cane Run facility, Zeon Chemicals, American Synthetic Rubber Co., and Rohm & Haas.

In sum, though they repeatedly describe the proposed class definition as "objectively reasonable," Plaintiffs offer no meaningful evidence that airborne contaminants *from Oxy Vinyls* spread in a uniform fashion in all directions from Defendants' facility for a distance of up to two miles, or really that they spread from Oxy Vinyls at all.[5]  Instead, Mr. Wabeke's report shows only that one person in the proposed class area has something on his car not attributable to any particular source, and that some sort of unidentified particles were in the air at a higher concentration close to the northeast of Oxy Vinyls than they were further northeast or west of Oxy Vinyls.  The impact of the air sampling is substantially limited by, among other things, the

---

[5]Indeed, the only evidence presented that actually speaks to how pollutants might spread from Defendant's facility is the URS Corporation air modeling report commissioned by Defendant.  Def.'s Resp. to Pls.' Mot. for Class Certification at 8-10.  The Court refers to this report not to imply that it is dispositive, but simply to identify what sort of evidence it believes would be helpful in establishing a justifiable class definition.

13

absence of any sampling southwest of the highest-concentration point and any attempt to account for the presence of other potential sources.

Therefore the Court is left without a basis upon which it could properly conclude that the members of the proposed class are distinguishable from the general public. For example, Plaintiffs offer no way in which the proposed class members would be distinguished from those whose property was damaged by similar emissions from other facilities. *Cf. Olden*, 282 F.3d at 508 (noting that the toxins emitted by the defendant were distinguishable from those emitted by "other industrial sources" nearby). Indeed, the flaws inherent in a class defined without a "reasonable relationship" to Defendant's activities will become even more apparent in the Court's analysis of certification under 23(b)(3) below.

Nevertheless, Plaintiffs seem to say that simply by filing *any* expert report they should be entitled to class certification, and that *any* critical examination of their expert report amounts to an improper inquiry into the merits of the case. *See, e.g.*, Pls.' Reply at 2, 4–9. Even more boldly, Plaintiffs urge the Court to ignore virtually all evidence proffered by Defendant on the issue of class certification. *Id.* at 4, 8. The Court believes that this is the wrong approach.

What Plaintiffs ignore in their protestations against any and all examination of their evidence in support of class certification is that simply filing a document styled as an expert report does not automatically establish "a scientific basis for [a] class definition." Moreover, as this Court has made clear on other occasions, *see, e.g., Brockman*, 2007 WL 4162920, at *4 n.3, probing Plaintiffs' class certification evidence with reference to Defendant's evidence is emphatically *not* the "statistical dueling" warned against in *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. 1999). To the contrary, accepting Plaintiffs' assertions would,

14

to cite one example, require the Court to ignore the additional factual information that the testing lab has now disclosed.  Surely the Court should not blindly accept the representations of their expert without the benefit of the complete factual picture provided by Defendant's evidence.

Therefore it is entirely proper to probe the Plaintiffs' evidence on the issue of class certification, and the Court reemphasizes that in doing so it will continue to refrain from improperly inquiring into the merits of Plaintiffs' case.  But the general principles of class action jurisprudence set forth in *Eisen* do not counsel in favor of certification here, due to the Court's threshold concerns regarding the proposed class definition.  Now the Court will consider whether Plaintiffs satisfy the numerosity, typicality, commonality, and adequacy of representation factors of Rule 23(a).

B.

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "There is no strict numerical test for determining impracticability of joinder," *In re Am. Med. Sys., Inc.,* 75 F.3d at 1079 (6th Cir. 1996), but "impracticability of joinder must be positively shown, and cannot be speculative." *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.,* 200 F.R.D. 382, 389 (S.D. Ohio 2001)). Plaintiffs argue numerosity is easily met because tens of thousands of persons live within the proposed class area.  Pls.' Mot. for Class Certification at 18-20.

However, as this Court has noted, "numerosity . . . is inextricably bound up in the question of class definition." *Paulley v. Chandler*, 2000 WL 33975579, *1 (W.D. Ky. Apr. 18, 2000).  Therefore "a flawed class definition can make it difficult to determine whether a class defined by geographical boundaries satisfies the numerosity requirement," and indeed, courts

15

faced with overbroad proposed classes have rejected plaintiffs' numerosity arguments due to this difficulty. *Burkhead*, 2008 WL 782829, at *7 (citing *Duffin,* 2007 WL 845366, at *5; *Dippery v. Amoco Prod. Co.*, 1995 WL 478948, *2 (D.N.M. Apr. 21, 1995)). Here, the proposed class would include approximately 33,865 individuals. Pls.' Mot. for Class Certification at ¶ 3. Therefore, if the class were determined to have been properly defined, Plaintiffs would easily have met the numerosity requirement.

C.

The commonality requirement generally is satisfied where there is a "single issue common to all members of the class." *In re Am. Med. Sys., 75 F.3d at 1080.* The requirement seeks "a common issue the resolution of which will advance the litigation." *Sprague*, 133 F.3d at 397. Here, Plaintiffs assert that common issues of fact include:

> (1) the cause of Oxy Vinyl's [sic] emissions; (2) whether Oxy Vinyl's [sic] emissions were foreseeable; (3) were there any precautions Oxy Vinyl [sic] could have taken to have prevented the emissions; (4) whether Oxy Vinyl [sic] exercised any available precautions to prevent the emissions; (5) the amount of Exemplary Damages the Plaintiff Class is entitled to from Oxy Vinyl [sic]; and (6) the type of economic impact Oxy Vinyl's [sic] emissions had upon the Plaintiff class.

Pls.' Mot. for Class Certification at 21. According to Plaintiffs, the common questions of law include Defendant's liability for nuisance, negligence and or gross negligence, or trespass or strict liability, whether the Plaintiff Class is entitled to exemplary damages, and whether the Plaintiff class is entitled to injunctive relief. *Id.*

Certainly the broadly drawn class boundaries call into question Plaintiffs' argument that a single source of conduct is applicable to each class member. After all, multiple industrial facilities emit carbonized material within the proposed class boundary and that some of the

16

proposed class members live closer to facilities other than Oxy Vinyls.  *Cf. Ball* v. *Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004) (distinguishing from *Sterling* a situation in which there were multiple contractors who operated a site, each of whom presumably would have a different level of liability).  However, such concerns are more properly addressed by Rule 23(b).  The existence here of some common factual questions the classwide adjudication of which would advance the litigation here will suffice to satisfy the commonality requirement of Rule 23(a).

D.

A plaintiff's claim may be considered typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.* 75 F.3d at 1082 (citing 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3-13, at 3-76 (3d ed.1992)).  The representative plaintiffs' interests should be aligned with those of the proposed class, such that "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399.  Importantly, "the typicality requirement is not met if the named plaintiffs do not represent an adequate cross-section of the claims asserted by the rest of the class." *Reeb v. Ohio Dept. of Rehab. & Corr.*, 435 F.3d 639, 645 (6th Cir. 2006).

As in *Burkhead*, the Court is unable to conclude based on the evidence before it that Plaintiffs represent an adequate cross-section of the proposed class.  For example, each proposed class member's relative proximity to Defendant's facility or one of the other facilities noted above may completely eliminate Defendant's liability for the alleged harm they experienced. *See, e.g., Daigle*, 133 F.R.D. at 600 (finding that the defendant's liability would likely "differ

17

dramatically from one plaintiff to the next"). *Cf. Olden*, 383 F.3d at 508, 509 n.5 (noting that "the defendant [did] not allege that the toxins from [other] sources [we]re indistinguishable from the toxins from [the defendant's] plant," and that the class showed "that their properties were frequently covered by cement dust," a contaminant directly and uniquely attributable to the defendant); *Boggs*, 141 F.R.D. at 65 (noting that "[t]he harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered is of the same type"). Mr. Wabeke's report provides no assurance of typicality, since a single sample of settled dust cannot be "typical" of anything where no larger sample set exists. And unidentified particles in the air show nothing when they are not connected to Oxy Vinyls in any meaningful way.

Despite Plaintiffs' assertions that bifurcation of liability and damages would address any concerns about Defendant's liability to each and every class member, the presence of multiple industrial facilities in the vicinity strongly suggests that "no single proximate cause equally applies to each potential class member and each defendant." *See Sterling*, 855 F.2d at 1197; *Burkhead*, 2008 WL 782829, at *8 (noting similar concerns where "[o]ther members of the proposed class appear to live in areas subject to completely different influences"). The assurances inherent in *Boggs* and *Olden* that the trespasses and nuisances alleged were the result of a single defendant's activities are simply not present here. Therefore it is impossible at this time to conclude that the proposed representatives are "typical" of the class they purport to represent.

18

E.

The adequacy of representation inquiry under Rule 23(a)(4) seeks to discover conflicts of interest between named representatives and the class they seek to represent, s*ee Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997)*,* and so "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). As the Supreme Court has noted, [t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem*, 521 U.S. at 626 n.20 (quoting *Falcon*, 457 U.S. at 157 n.13 (1982)). The adequacy heading also factors in competency and conflicts of class counsel. *Amchem*, 521 U.S. at 626 n.20 (quoting *Falcon*, 457 U.S. at 157 n.13, 158).

As in *Burkhead*, here Plaintiffs have voluntarily foregone their original personal injury claims against Oxy Vinyls. Kentucky law would bar absent class members from later asserting such claims, calling into question the ability of the proposed representatives to adequately protect the interests of absent class members. *Burkhead*, 2008 WL 782829, at *9 (citing *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky.1998), and for the ramifications thereof *Martin v. Home Depot, U.S.A., Inc.*, 225 F.R.D. 198, 203 (W.D.Tex. 2004); *In re MTBE*

19

*Prods. Liab. Litig.*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002); *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550-51 (D.Minn.1999)).[6]

In view of these considerations, the Court cannot conclude that "the interests of the class members will be fairly and adequately protected in their absence," *Amchem*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231 (quoting *Falcon*, 457 U.S. at 157 n. 13).

## V.

In addition to meeting the four requirements of Rule 23(a), a purported class must meet at least one of the requirements of Rule 23(b).  Here, Plaintiffs have moved to certify their class under Rule 23(b)(2) as well as under Rule 23(b)(3).

### A.

Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Such classes should only be certified where the relief requested does not relate "exclusively or predominantly to money damages."  *Burkhead*, 2008 WL 782829, at *10 (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note).  And as explained by the Fifth Circuit:

---

[6]In *Burkhead*, Plaintiffs' counsel cited other state courts' solutions to adequacy concerns, which included "'limit[ing] the class issues to liability . . . . and allow[ing] each class member to use that judgment as a basis for an individual action to recover damages for the breach,' as well as 'divid[ing] the class into subclasses,' and 'us [ing] the class notice procedure to give those class members with [personal injuries] the opportunity to opt out of the class.'" *Burkhead*, 2008 WL 782829, at *9 (citing *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 107 Cal.Rptr.2d 761, 775 (2001)).  The Court rejected these suggestions for a variety of reasons, not least of which was that they would "shift the responsibility for resolving any infirmities in the proposed class definition from Plaintiffs onto the Court[, which] does not have a sufficient basis for redrawing or refining the proposed class."  *Burkhead*, 2008 WL 782829, at *9–10.

> monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief.  By incidental, we mean damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief . . . . such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.  Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex determinations.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998) (internal citations omitted);

*see also Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir. 2002) (denying

certification to a proposed (b)(2) class where "the individualized determinations necessary to

calculate the amount of damages each class member would be entitled to eliminates the

efficiencies created by adjudicating these claims on a classwide basis"); *Burkhead*, 2008 WL

782829, at *10 (citing *Reeb*, 435 F.3d at 647, for the proposition that "potential problems [are]

inherent in certifying (b)(2) classes where monetary damages are at issue, since in such

situations the notice and opt-out protections present in the (b)(3) context are not required, yet the

concerns motivating the imposition of those protections . . . are pronounced") (internal quotation

marks and citations omitted).

     Here, Plaintiffs seek compensatory damages and "any and all further relief, including

equitable relief."  As in *Brockman* and *Burkhead*, the monetary damages Plaintiffs seek here are

more than "incidental," triggering the concerns discussed in *Allison*, *Coleman*, and *Reeb*.  The

Court's analogy in *Burkhead* to *In re Sch. Asbestos Litig.* applies equally here, since "despite the

plaintiffs' ingenuity the claims in this suit were essentially for damages."  *Burkhead*, 2008 WL

782829, at *11 (quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986)).  Furthermore,

Plaintiffs' invocation of *Olden* is as unavailing here as it was in *Burkhead*.  2008 WL 782829, at

*11 (finding minimally persuasive an extremely permissive and limited district court analysis

leading to (b)(2) *and* (b)(3) certification which was affirmed under an abuse-of-discretion

standard).  In sum, plaintiffs are not seeking money damages that courts have found to be truly

"incidental."  *Cf., e.g., O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 338 (C.D. Cal. 1998)

(certifying a (b)(2) medical monitoring class, which would not necessitate determination of

"individual causation issues" for payment of monetary damages).  Therefore, the Court finds that

certification under Rule 23(b)(2) is inappropriate.

B.

Certification under Rule 23(b)(3) is appropriate when "the questions of law or fact

common to the members of the class predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) classes therefore must

satisfy a two-part test of commonality and superiority, and should only be certified if doing so

would "achieve economies of time, effort, and expense."  *Sterling,* 855 F.2d at 1196; *see also*

*Amchem*, 512 U.S. at 615.  The Sixth Circuit has provided further guidance on what sorts of

cases may be best suited to class adjudication:

> In complex, mass, toxic tort accidents, *where no one set of operative facts establishes liability*, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy.  However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct *which is identical for each of the plaintiffs*, a class action may be the best suited vehicle to resolve such a controversy.

*Sterling,* 855 F.2d at 1197 (emphasis added); *see also In re Am. Med. Sys.*, 75 F.3d at 1084; Rule

23(b)(3) advisory committee's note.  In contrast to Rule 23(a)'s commonality requirement,

22

discussed above, Rule 23(b)(3)'s "predominance criterion is far more demanding." *Amchem*, 521 U.S. at 624.

Of course, a need for individualized damages determinations is not necessarily fatal to (b)(3) certification. *See, e.g., Olden*, 383 F.3d at 509; *Sterling*, 855 F.2d at 1197. And "courts can often bifurcate class action proceedings, adjudicating liability on a classwide basis, and then "if liability is found, the issue of damages can be decided by a special master or by another method." *Olden,* 383 F.3d at 509; *see also In re School Asbestos Litig.*, 789 F.2d at 1010. However, when a common cause of injury cannot be taken as a given, "the factual and legal issues *do* differ dramatically from individual to individual." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1084 (reversing (b)(3) certification in the context of medical device products liability actions, since "no single proximate cause applies equally to each potential class member"). Therefore, as in *Burkhead* and *Brockman*, the question here is whether common factual and legal questions predominate, that is, whether any individualized questions relate solely to the amount of damages potentially owed to each class member.

Plaintiffs have failed to provide evidence that "the defendant's liability can be determined on a class-wide basis." *Sterling*, 855 F.2d at 1197. Though Plaintiffs allege that Defendant's operations result in extensive emissions; what remains missing is any evidence that the *cause* of the entire class's damages could be determined in a single proceeding. Mr. Wabeke's report certainly provides no such assurances, for all of the reasons discussed above. *Cf., e.g., Olden*, 282 F.3d at 508 (noting that the toxins emitted by the defendant were distinguishable from those emitted by "other industrial sources" nearby, and therefore assuming that the defendant's plant

was the sole source of any damage the class members suffered, which would allow a causation determination as to one class member to be extrapolated to all).

As the Court pointed out in *Burkhead*, proof of Plaintiffs' trespass claim requires "an intrusion (or encroachment) which is an unreasonable interference with a property owner's possessory use of his/her property," *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 57 (Ky.2007), and a nuisance "arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage." *Smith v. Carbide & Chems. Corp.*, 507 F.3d 372, 379-80 (6th Cir.2007) (citing *City of Somerset v. Sears*, 313 Ky. 784, 233 S.W.2d 530, 532 (1950)). Just as in *Burkhead* and *Brockman*, the critical evidence of causation as to either claim, or as to the remainder of Plaintiffs' claims, will be based upon highly individualized testimony given the near-uselessness of Mr. Wabeke's report. Thus, the Court cannot be assured that Defendant's liability to the class will be a common question or that a class action would be the superior method of adjudicating Plaintiffs' claims. Therefore, the Court finds that Plaintiffs do not satisfy Rule 23(b)(3).

VI.

Generally speaking, Plaintiffs' arguments, which are largely the same as those advanced in *Brockman* and *Burkhead,* focus on the assertion that the numerous mass environmental tort cases in which courts have certified classes dictate certification here. But as the Court noted in *Burkhead*, "this observation is of minimal persuasiveness, given the significant differences between the evidence supporting most of those proposed classes and the evidence supporting the one proposed here." *Burkhead*, 2008 WL 782829, at *13. Plaintiffs urge the Court to certify

24

their proposed class despite any infirmities the Court might identify in Plaintiffs' evidence on the issue, asserting that such identification amounts to an improper inquiry into the merits of the case or that such infirmities might be addressed at a later time once the class is certified.  As the Court made clear in *Brockman* and *Burkhead*, while some cases may be read as supporting this supine approach to class certification, the Court believes such an approach verges on an abrogation of district courts' duties at the certification stage.

Rule 23 and the vast majority of other cases do not support the idea that simply by demanding a class and filing a document styled as an expert report a group of plaintiffs are thereby entitled to certification of whatever class they propose.  The Court rejects and finds indefensible this bald-faced assertion of entitlement, which the Court soundly rejected in previous hearings.  The Court's observation in *Burkhead* that "Plaintiffs bear the burden of producing something more than their wholly subjective belief that their property is affected by Defendant's emissions and that all those in a two-mile radius must be similarly affected" applies with equal force in this case.  2008 WL 782829, at *14.  Simply arguing that mass environmental tort accidents are often suitable for class certification serves little purpose for Plaintiffs unless and until they can demonstrate that a defined class has similarly experienced a mass environmental tort of some kind.

Plaintiffs have rested their Renewed Motion for Class Certification primarily on the strength of Mr. Wabeke's report.  However Mr. Wabeke's report is stunningly inadequate.  It is precisely the generalized and unsupported assumptions regarding the propriety of class certification Plaintiffs urge upon the Court here that Rule 23 guards against, and without anything other than what they have submitted here, Plaintiffs cannot be said to have carried their

25

burden of satisfying Rule 23.  Therefore the Court finds that certification of the class proposed by Plaintiffs would be inappropriate.

The Court will issue an order consistent with this Memorandum Opinion.

cc:    Counsel of Record